IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LAURAL L. CHAN,

        **Plaintiff,**

vs.   Case No. 03-2608-GTV

SPRINT CORPORATION,

        **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Laural L. Chan brings this employment discrimination action against her employer, Defendant Sprint Corporation. Plaintiff, who alleges that she suffers from a hypersensitivity to cigarette smoke and other chemicals, claims that Defendant has violated federal disability law and committed state torts by failing to discipline employees who have violated the company's smoking policy, which restricts smoking to designated areas outside. Plaintiff claims that smokers are allowed to smoke anywhere outside, including in front of building entrances and under covered walkways. She is unable to avoid the smokers, and is subjected to "environmental tobacco smoke" whenever she enters or leaves her building.

Defendant has filed a motion for summary judgment as to all of Plaintiff's claims (Doc. 28). For the following reasons, the court grants the motion.

## I.  FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to the non-moving party's case.  Immaterial facts and facts not properly supported by the record are omitted.  References to testimony are from depositions, unless otherwise noted.

Plaintiff Laural Chan works as a "project manager" on the Sprint campus in Overland Park, Kansas.  Plaintiff has worked for Sprint for twelve years, but was only assigned to the Sprint campus in July 2002.  Her duties as a project manager include scheduling large events, writing presentations, and handling executive projects and special requests.

The Sprint campus has between 13,500 and 14,000 employees, covers approximately two hundred acres, and has about seventeen buildings and a roughly equivalent number of parking garages.  During her tenure on the campus, Plaintiff has been assigned to "Earhart B," a five-story building on the north end of the campus that houses approximately four hundred employees.  Plaintiff testified that the percentage of time she is required to leave her building to perform her job duties "depends on the project that [she is] working on," but weeks go by when she can perform all of her job duties within her building.  Plaintiff's supervisor, Christine Brown, does not believe that Plaintiff needs to leave her building to perform her job duties, but states that it was probably more important when Plaintiff first started at the campus to move around.

The Sprint campus has a smoking policy under which smoking is prohibited inside of company buildings, and smoking outdoors is restricted to designated areas.  Despite this policy, Plaintiff has seen people smoking outside "wherever they please."  On her first day on the Sprint

campus, she saw groups of smokers constantly on the walkway behind her building, such that when she walked out of her building, she was in the middle of smokers. She has taken pictures of smokers lined up under covered walkways and has witnessed them leaning on no-smoking signs. When she attempts to go to a meeting on campus, she encounters smokers as she leaves her building door and then again every few yards. Plaintiff claims that taking alternative routes is useless because people smoke all over campus. She claims that the covered walkways attract smokers, as do the ashtrays that Defendant has placed in front of building entrances.

### A. Plaintiff's Impairment

Plaintiff suffers from mixed rhinitis, an allergic condition, and a sensitivity to certain irritant chemicals. She has suffered from this impairment since childhood, and expects it to last lifelong. She claims this impairment prevents her from being around cigarette smoke and other noxious chemicals, including materials with ammonia, paint thinners, cleaners, exhaust fumes, formaldehyde, bug sprays, fertilizers, turpentine, aerosol hairsprays, and some fragrances, as well as mold. Whenever Plaintiff is exposed to these substances, her lungs and throat burn and she has trouble breathing. When exposed to cigarette smoke in particular, Plaintiff develops "an intense, extreme burning" and itching in her eyes, which typically lasts for the remainder of the day on which she was exposed. She also develops headaches, burning in her breathing passages, and "hacking coughs" that can last for several days, as well as blurred vision lasting from a few hours up to a day.

Since the summer of 2002, Plaintiff claims that she has suffered some or all of these symptoms from exposure to environmental tobacco smoke on thirty to thirty-four occasions. At

times, she has used eye drops to lessen the pain in her eyes, prescription medications to relieve her congestion and allergies, and over-the counter medicine such as Advil or Tylenol to alleviate her headaches.  She claims that in addition to the physical injuries she has suffered due to smoke exposure, she also has "secondary stress related issues," such as sores in her mouth, abdominal pain, and a rash.  Stress-related chronic pain in her hands is also exacerbated when she is exposed to smoke.  She also feels "blown off" because of her employment situation, often feels like crying, and frequently cries at home.  She has never been hospitalized because of cigarette smoke exposure and has never seen a mental health provider regarding her stress issues.

Plaintiff has seen two doctors for treatment pertaining to smoke exposure on the Sprint campus: Dr. James Cheray, an internist that she has seen since 1995, and Dr. Jeffrey Wald, an allergist whom she first saw in July 2003.  Plaintiff has seen Dr. Wald three times.  Dr. Wald performed a breathing test, which found that Plaintiff's lung capacity was "in the normal range," and that she did not appear to have any type of breathing disorder.

Plaintiff has never had to leave work due to her symptoms, and has missed less than a week of total time due to the effects of smoke exposure on the Sprint campus.  She has, however, on ten to twelve occasions, been unable to work on her computer due to the problems with her eyes.

When Plaintiff goes to stores or other places, she usually goes with her husband so he can look out for smokers.  She shops at stores and goes to restaurants where she believes there will be no or few smokers, shops at off-hours, and avoids discount stores.  When she does go to a store, she parks near the front entrance to determine if smokers are present and, if they are, she waits for them to leave before entering.

4

Plaintiff's sensitivity to environmental tobacco smoke has reduced the amount of proselytizing that she can do as a Jehovah's Witness. She has gone only about ten times over a two-year period, while others go out as much as two to four hours per week. She does not take vacations "for the fun of it" because she fears being exposed to smoke in unfamiliar places. She visited her sister in Las Vegas, Nevada in January 2004, but stayed at her sister's house, and did not attend any shows or go to any restaurants. She and her husband traveled to attend two weddings in 2003-2004, but she did not attend any pre-wedding activities. Although she and her husband have season tickets to the Kansas City Wizards professional soccer games, she either arrives early or thirty minutes after the game starts to try to minimize problems with smokers.

### B. Plaintiff's Requests for Accommodation

In late July and early August 2002, Plaintiff sent multiple e-mails to employee relations and human resources representatives complaining about smokers on campus violating the smoking policy. Heather Thorndike, a human resources representative, responded to the e-mails, and sent a memo to all campus employees in Plaintiff's business unit reminding them of the smoking policy, the designated areas, and the need to avoid walking to the areas with lighted cigarettes. She indicated that violators could be subject to "corrective action." Defendant also ran a series of announcements on television monitors throughout the campus reminding employees of the smoking policy. At one point during the communication between Plaintiff and Thorndike, Thorndike told Plaintiff that the human resources department would be open to hearing ideas on how to prevent violations of the policy. Plaintiff responded with a proposed revision of the policy that involved using security guards to ticket violators, building shelters over the designated areas,

5

conducting surveys or employee focus groups regarding the policy, and publicizing smoking cessation events.

On June 24, 2003, Plaintiff's attorney sent a letter to Defendant formally requesting a reasonable accommodation under the ADA. In response to the letter, Gene Lampe, a supervisor in the human resources department, contacted Plaintiff and asked for medical information before meeting to discuss the smoking policy. On July 14, 2003, Plaintiff completed a "Request for Employee Medical Information," and on July 31, Diane Shoemaker-Katz, Defendant's director of labor and employee relations, sent Plaintiff a letter outlining a series of allowances it was offering to help Plaintiff avoid cigarette smoke exposure.

In the letter, Shoemaker-Katz suggested that Plaintiff use sidewalks and routes on the campus that do not pass by designated smoking areas, schedule all meetings in her building or arrange to attend by teleconference, and do a percentage of work from her home by telecommuting. Plaintiff never responded to the July 31 letter. She did not believe the allowances were effective because they did not "eliminate the problem." Plaintiff also contended that the telecommuting option isolated her and was unfavorably regarded in the Sprint culture.

In multiple meetings and e-mails to human resources representatives, Plaintiff asked that smokers be restricted to designated areas – in other words, Plaintiff asked that Defendant enforce the smoking policy. On November 7, 2003, Shoemaker-Katz responded to an e-mail from Plaintiff, setting forth several factors that she believed made it difficult to enforce the smoking policy in the manner requested by Plaintiff. She noted significant layoffs and reduction of resources at Sprint, as well as the size of the campus and the number of employees. She invited

Plaintiff to contact her to discuss it further, and invited her to do so again on November 19. Plaintiff did not respond to either invitation because she felt like Shoemaker-Katz was only willing to discuss the accommodations offered by Defendant, not enforcement of the smoking policy.

On January 30, 2004, Plaintiff asked that her husband be allowed to stop his car on Sprint Parkway in order to pick her up and drop her off at the second-floor entrance to her building without being asked by campus security to move. The request was granted. Plaintiff's supervisor has also allowed her to work from home and begin and leave work early when she has asked to do so based on smoke exposure issues. And Defendant has offered Plaintiff the option of having a campus security vehicle transport her between buildings. Although Plaintiff has utilized this option, she contends that it is embarrassing and isolates her.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the

nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. Anderson, 477 U.S. at 256. "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Id. The court must consider the record in the light most favorable to the nonmoving party. Bee v. Greaves, 744 F.2d 1387, 1396 (10th Cir. 1984).

### III. DISCUSSION

#### A. Failure to Accommodate under the ADA

Plaintiff first claims that Defendant failed to accommodate her disability under the ADA. For the following reasons, the court determines that Plaintiff does not have a disability, and even if she does, Defendant provided her with reasonable accommodation.

##### *1. Whether Plaintiff has an "Actual Disability" under the ADA*

A person is considered to have a "disability" under the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such impairment; or (3) is regarded by the employer as having such an impairment. Tate v. Farmland Indus., Inc., 268 F.3d 989, 992 (10th Cir. 2001) (quoting 42 U.S.C. § 12102(2)). Plaintiff claims that she qualifies as "disabled" because she has an actual disability that substantially limits her major life activities of breathing and seeing.

8

The court applies a three-part test to determine whether a plaintiff qualifies as actually "disabled" under the first definition. First, the court must ascertain whether the plaintiff suffers from a physical or mental impairment. Bragdon v. Abbott, 524 U.S. 624, 631 (1998). Second, the court must identify the life activities affected by the impairment and determine whether those activities qualify as major life activities under the ADA. Id. Finally, the court must decide whether the impairment "substantially limits" any of the identified major life activities. Id. Whether the plaintiff has an impairment under the ADA is a legal question for the court. Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1129 (10th Cir. 2003) (citation omitted). Whether the conduct affected is a major life activity is also a question of law. Id. (citation omitted). But the trier of fact should ascertain whether the impairment substantially limits the major life activity. Id. (citation omitted).

Here, the first two elements are not at issue. Defendant concedes that Plaintiff has an impairment, and Plaintiff alleges that her impairment affects the activities of breathing and seeing, both of which qualify as "major life activities" under the ADA. See 29 C.F.R. § 1630.2(i) (defining "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working").

The only issue before the court, then, is whether Plaintiff's breathing and seeing are "substantially limited" by her impairment. The existence of a disability is evaluated on a case-by-case basis, such that plaintiffs must offer "'evidence that the extent of the limitation caused by their impairment *in terms of their own experience* is substantial.'" Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002) (citations and internal alterations omitted and emphasis

9

added).  Any impairments that interfere in only a minor way with a major life activity are precluded from qualifying as disabilities.  Id. at 197 (citing Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999)).  "An impairment 'substantially limits' a major life activity if the individual is unable to perform the activity or is significantly restricted in the ability to perform the major life activity compared to the general population."  Lusk v. Ryder Integrated Logistics, 238 F.3d 1237, 1240 (10th Cir. 2001) (citing 29 C.F.R. § 1630.2(j)(1)).

"A court must consider three factors in determining whether an impairment substantially limits a major life activity: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact resulting from the impairment."  Id. (citing 29 C.F.R. § 1630.2(j)(2)).  In essence, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Toyota Motor, 534 U.S. at 198.

Finally, although some impairments may be considered substantially limiting on their face, most require that the plaintiff present comparative evidence that the limitations are significantly below those of the average person.  Bristol v. Bd. of County Comm'rs, 281 F.3d 1148, 1161 n.4 (10th Cir. 2002) ("Bristol pointed to no evidence of how much the average person can lift. Without this evidence, a factfinder cannot make the comparison between Bristol and the 'average person' as ADA regulations require."); Lusk, 238 F.3d at 1241; Doyal v. Okla. Heart, Inc., 213 F.3d 492, 497 (10th Cir. 2000) ("Because Doyal introduced no evidence suggesting she experienced greater difficulty than anybody else learning the new computer system or any other new material, she has failed to demonstrate that she was significantly restricted in learning.").

The court concludes that, based on the uncontroverted evidence, no reasonable trier of fact could find that Plaintiff's impairment substantially limits her breathing or seeing. First, the nature and severity of Plaintiff's impairment weigh against a conclusion that Plaintiff has established that there is a genuine issue as to whether a major life activity is substantially limited. Plaintiff has never sought medical care during an episode or directly afterward. She has never left work due to her condition, has never been hospitalized, and continues to participate in numerous activities of daily living. See Albert v. Smith's Food & Drug Ctrs., Inc., 356 F.3d 1242, 1250 (10th Cir. 2004) (discussing how the plaintiff's asthma affected her in everyday situations). She even received a proficiency promotion at a time when she claims that her exposure to smoke was at its worst. Plaintiff acknowledges that she is able to work, take care of herself, shop at stores where smokers are not prevalent, cook, eat, travel (although she limits her travel), and attend professional soccer games, although she monitors when she arrives and leaves. Plaintiff's range of everyday activities indicate that she is not substantially limited in the major life activities of breathing or seeing. Cf. Harmon v. Sprint United Mgmt. Corp., 264 F. Supp. 2d 964, 969 (D. Kan. 2003) (holding that the plaintiff was not disabled when the evidence showed that he could work as a computer programmer, shower and bathe himself, commute to and from work, care for himself, vacuum, do the laundry, load and unload the dishwasher, and prepare meals, among other things).

Second, although Plaintiff has testified that she expects her impairment to last the rest of her life, she has not shown that she suffers any permanent or long-term impact from her impairment. Any effects Plaintiff experiences from smoke are sporadic and temporary. See Mayers v. Washington Adventist Hosp., 131 F. Supp. 2d 743, 749 (D. Md. 2001), aff'd, 22

11

Fed. Appx. 158 (4th Cir. 2001) (holding that the plaintiff's breathing was not substantially limited when she experienced only temporary difficulty in breathing due to workplace environmental conditions or seasonal changes). She has identified just over thirty manifestations of her impairment during the two years she has been on the Sprint campus. The symptoms generally lasted no more than a day. "To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds." EEOC v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001) (holding that a plaintiff experiencing epileptic seizures once or twice a week was not disabled); see also Lara v. State Farm Fire & Cas. Co., No. 02-1208-WEB, 2003 WL 22149667, at *10 (D. Kan. July 24, 2003) (citations omitted) ("[A] temporary impairment . . . does not constitute a disability within the coverage of the ADA."); Crock v. Sears, Roebuck & Co., 261 F. Supp. 2d 1101, 1117 (S.D. Ia. 2003) (citing Sara Lee Corp., 237 F.3d at 353) ("[E]ven severe symptoms which are episodic do not constitute a substantial limitation on a major life activity.").

Finally, the court notes that Plaintiff has failed to present comparative evidence showing that her breathing and seeing are more restricted than the average person. She states simply in her brief that "[t]here clearly is an issue of fact as to whether [Plaintiff] is significantly restricted in her ability to breathe as compared with the general population." In the absence of comparative evidence, Plaintiff's claim cannot survive. See Bristol, 281 F.3d at 1161 n.4; Lusk, 238 F.3d at 1241; Doyal, 213 F.3d at 497.

Plaintiff cites several cases in support of her claim. Each of the cases is distinguishable on the facts. In Treadwell v. Dow-United Technologies, the court held that a genuine issue of

12

material fact existed as to whether the plaintiff's multiple chemical sensitivity syndrome substantially impaired her breathing.  970 F. Supp. 962, 972 (M.D. Ala. 1997).  The plaintiff suffered three allergic reactions requiring medical treatment while at work.  Id. at 971.  In the first, her tongue swelled, she had difficulty swallowing, she experienced a "tightness in [her] chest," and she felt a "burning sensation" when inhaling.  Id.  She presented to the plant physician, who found nothing significant with the plaintiff's lungs.  Id.  During the second reaction, the plaintiff began "sinking" to the floor, and was removed from the plant by wheelchair.  Id.  The third reaction involved coughing and gagging, but no breathing difficulties.  Id.  Again, the plaintiff saw the plant nurse.  Id.  In contrast, Plaintiff in the instant action never presented immediately for medical care or experienced an episode so severe she had to be removed from the workplace by wheelchair.

In Whillock v. Delta Air Lines, Inc., the district court also held that the plaintiff had shown that there was a genuine issue of material fact as to whether she was substantially limited in the major life activity of breathing.  926 F. Supp. 1555, 1562 (N.D. Ga. 1995), aff'd, No. 95-9169, 86 F.3d 1171 (Table) (11th Cir. May 16, 1996).  The Whillock plaintiff was hypersensitive to a number of chemicals and chemical odors, and twice had to be administered oxygen at her workplace after exposure to chemical agents.  Id.  The court held that there was a triable issue despite evidence that the plaintiff was able to do grocery shopping, visit her mother-in-law, and dine out once a week.  Id.  Again, administration of oxygen in response to the Whillock plaintiff's episodes distinguish the case from the one at hand.

The third case Plaintiff cites, Selenke v. Medical Imaging of Colorado, involved a plaintiff with chronic sinusitis.  248 F.3d 1249, 1252 (10th Cir. 2001).  The plaintiff claimed that her

13

condition caused congestion, infections, and recurring headaches when she was exposed to fumes in the workplace. Id. She also claimed that she had "'shortness of breath, especially when exposed to chemical smells in [her] dentist's office and stores, from copier machines and computer printers, insecticide sprays, and from colognes and perfumes and smoke.'" Id. at 1257 n.5. She added that she had suffered "'considerable muscle pain in [her] chest and back from difficulty breathing when so exposed.'" Id. The Tenth Circuit assumed without deciding that the plaintiff presented sufficient evidence for a trier of fact to conclude that her breathing was substantially impaired, then held that the plaintiff had not been discriminated against on the basis of any such disability. Id. at 1259, 1261, 1264, 1266. Because the Tenth Circuit did not decide whether the plaintiff had a disability under the ADA, Selenke does not provide guidance in the instant case.

Finally, Plaintiff's reliance on Albert v. Smith's Food and Drug Centers, Inc. fares no better. In Albert, the plaintiff claimed that her asthma substantially limited her ability to breathe. 356 F.3d at 1250. The asthma was triggered by a number of common substances, including pollen, mold, cleaning agents, chemicals, dust, cold air, and stress. Id. at 1250-51. The plaintiff was symptomatic most of the time, although she regularly took medication. Id. at 1251. Even when not having an asthma episode, she experienced wheezing, coughing, chest tightness, and shortness of breath. Id. To avoid experiencing asthma attacks, the plaintiff avoided cigarette smoke, crowds, nighttime or outdoor activities, and perfumes. Id. at 1250. She was hospitalized multiple times and made frequent trips to the emergency room. Id. at 1251. The Tenth Circuit held that the plaintiff raised a genuine issue as to whether her asthma substantially impaired her breathing. Id.

14

Again, the Albert plaintiff's symptoms were more severe and treatment was more frequent and aggressive than Plaintiff's in the instant case. Plaintiff has never been hospitalized or treated in the emergency room for her condition. She also has not testified that she is symptomatic most of the time. For these reasons, Plaintiff's case is distinguishable from that in Albert.

For all of the above-stated reasons, the court determines that Plaintiff has failed to establish that a genuine issue of material fact exists as to whether she is actually disabled under the ADA.

### *2. Whether Defendant has Provided Reasonable Accommodations*

Even if Plaintiff has established a genuine issue as to whether she is disabled, the court determines that Defendant has reasonably accommodated Plaintiff's disability.

To establish a prima facie case of failure to accommodate under the ADA, a plaintiff must show that: (1) he has a disability within the meaning of the ADA; (2) the employer had notice of his disability; (3) he could perform the essential functions of the job with reasonable accommodation; and (4) the employer refused to provide such accommodation. Bones v. Honeywell Int'l, Inc., 223 F. Supp. 2d 1203, 1218 (D. Kan. 2002), aff'd, 366 F.3d 869 (10th Cir. 2004) (citation omitted). Plaintiff's failing is that she cannot show that Defendant refused to provide a reasonable accommodation.

Plaintiff claims that Defendant failed to provide her preferred accommodation – Defendant refused to enforce its smoking policy. But "an employer is not required to provide the accommodation for a disabled employee that is ideal from the employee's standpoint, only one that is reasonable in terms of costs and benefits." Mays v. Principi, 301 F.3d 866, 872 (7th Cir.

15

2002); see Burnett v. W. Res., Inc., 929 F. Supp. 1349, 1359 (D. Kan. 1996) ("The ADA does not require an employer to create a position or alter present business practices and relationships in order to give an employee the best accommodation or the accommodation requested by the employee, so long as the accommodation made is reasonable.") (citations omitted). An employer "'has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.'" Smith v. Midland Brake, Inc., 180 F.3d 1154, 1177 (10th Cir. 1999) (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1137 (8th Cir. 1999)). "Stated plainly, under the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." Id. (quoting Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285-86 (11th Cir. 1997)).

In the instant case, the evidence before the court shows that Plaintiff formally requested a reasonable accommodation from Defendant. Specifically, she asked that the smoking policy be enforced. Defendant responded by offering several accommodations, including suggesting that Plaintiff use sidewalks and routes on the campus that do not pass by designated smoking areas, schedule all meetings in her building or arrange to attend by teleconference, and do a percentage of work from her home by telecommuting. Defendant later granted Plaintiff's husband permission to stop his car on Sprint Parkway in order to pick her up and drop her off at the second-floor entrance to her building without being asked by campus security to move. Plaintiff's supervisor has also allowed her to work from home and begin and leave work early when she has asked to do so based on smoke exposure issues. And Defendant has offered Plaintiff the option of having a

campus security vehicle transport her between buildings.

The court concludes that these allowances are reasonable as a matter of law. They offer Plaintiff ways to avoid or minimize exposure to cigarette smoke. Although Plaintiff feels that telecommuting and teleconferencing would isolate her, many courts have held that telecommuting can be a reasonable accommodation. See, e.g., Humphrey v. Mem'l Hosps. Assoc., 239 F.3d 1128, 1136 (9th Cir. 2001); Moore v. Walker, 24 Fed. Appx. 924, 929 (10th Cir. 2001). Plaintiff claims that the offered accommodations would deny her the "equal privileges and benefits of employment as are enjoyed by . . . other similarly-situated employees without disabilities." C.F.R. § 1630.2(o)(1)(iii). In particular, she claims that telecommuting or teleconferencing would not allow her "to attend social and cultural events on campus or use the cafeterias and various retail stores on the campus."

Plaintiff has not cited any authority suggesting that the "privileges and benefits" protected under C.F.R. § 1630.2(o)(1)(iii) include such activities as attending social or cultural events, using the cafeterias, or using retail stores. The ADA's reach does not extend to protect those who cannot participate in "those activities that, although important to the individual plaintiff, are not significant within the meaning of the ADA." Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999).

Moreover, Plaintiff has rejected the offered accommodations. "'If a [plaintiff] rejects a reasonable accommodation, aid, service, opportunity or benefit . . ., the individual will not be considered a qualified individual with a disability.'" Smith, 180 F.3d at 1177 (quoting 29 C.F.R. § 1630.9(d)). For these reasons, the court concludes that Plaintiff is unable to establish a prima

facie case of discrimination for failure to accommodate.

### B.  Hostile Work Environment under the ADA

In order to present a viable hostile work environment claim, assuming that one is recognized in the Tenth Circuit, Plaintiff must be disabled under the ADA.  See Shaver v. Indep. Stave Co., 350 F.3d 716, 720 (8th Cir. 2003) (holding that one of the elements of a hostile work environment claim is that the claimant is a qualified individual with a disability).  Because the court has held that Plaintiff failed to establish that a genuine issue of material fact exists as to whether she is disabled, her hostile work environment claim fails.

### C.  State Law Claims

Having dismissed all of Plaintiff's claims over which the court has original jurisdiction, the court declines to exercise supplemental jurisdiction over the remaining state law claims.  See 28 U.S.C. § 1367(c)(3) (1994); United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

IT IS, THEREFORE, BY THE COURT ORDERED that Defendant's motion for summary judgment (Doc. 28) is granted.

The case is closed.

Copies or notice of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**

Dated at Kansas City, Kansas, this 11th day of January 2005.

/s/ G. T. VanBebber
G. Thomas VanBebber
United States Senior District Judge